UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :
                             :
v.                           :    Criminal Case No. 14-67 (GK)
                             :
HAROLD CASTLE,               :
                             :
         Defendant.          :

## MEMORANDUM AND ORDER

On April 14, 2014, Defendant, Harold Castle, filed a Motion to Suppress Evidence [Dkt. No. 6]. The Government filed an Opposition on April 30, 2014 [Dkt. No. 7]; Defendant filed a Reply on May 5, 2014 [Dkt. No. 8]; and the Government filed a Supplemental Opposition on May 30, 2014 [Dkt. No. 15]. The Court held a Motion Hearing on June 30, 2014. Defendant filed a "Supplemental Submission of Radio Run" on July 1, 2014 [Dkt. No. 20]. For the following reasons, the Court concludes that the Motion shall be **denied**.

### I. BACKGROUND

Defendant seeks to suppress evidence resulting from an investigative stop conducted by two Metropolitan Police Department officers on the evening of February 24, 2014. As has long been established, it is not unconstitutional for police officers to make brief investigatory stops of individuals if they have a reasonable, articulable suspicion that the person is engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 30-31 (1968); United States v. Brody, 742 F.3d 1058, 1063 (D.C. Cir. 2014).

In considering whether a police officer had a reasonable, articulable suspicion to justify an investigatory stop, the Supreme Court has ruled that courts must consider the totality of all the surrounding circumstances. United States v. Sokolow, 490 U.S. 1 (1989). The court must view the

circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his [or her] experience and training." United States v. Edmonds, 240 F.3d 55, 60 (D.C. Cir. 2001). "Even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors--especially when viewed through the eyes of an experienced officer--may [be sufficiently probative of wrongdoing to give rise to a reasonable suspicion]." Id. at 59.

The Government presented the testimony of two Metropolitan Police Department officers, Officer Konrad Olszak and Officer David Moseley, both of whom were credible witnesses. No testimony was presented by the Defendant, although there was vigorous cross-examination of the Government witnesses. Based upon the following evidence,[1] the Court concludes that the Government's stop and subsequent arrest of Defendant was in full compliance with Terry, Edmonds, and the long list of cases that flesh out the Terry doctrine.

1. On February 24, 2014, members of the Metropolitan Police Department Narcotics Special Investigative Division, Gun Recovery Unit were on gun interdiction patrol in the area of the Seventh District. It was a very cold evening and it was dark. Officers Olszak and Moseley were driving an unmarked pickup truck with Florida license plates, which they regularly used to patrol the area. The officers wore plain clothes and vests with the word "police" displayed on the front and back.

2. At approximately 6:30 p.m., Officers Olszak and Moseley turned left from First Street, S.E. onto the 100 block of Yuma Street, S.E. They knew this block to be one in which there is

---

[1] Citations to the transcript are not provided because a final transcript has not yet been prepared.

"significant PCP distribution and use." In particular, the officers knew the apartment complex at 133 Yuma Street as one where men stood outside to sell PCP and at which the smell of PCP was often present. The officers typically drove through the area on patrol at least three to four times per week.

3. Both officers had seen Defendant "hang[ing] out in front" of the complex at 133 Yuma Street with other men on several prior occasions. Furthermore, they knew him from several prior PCP-related arrests and incidents in the area. At least two of these prior incidents, which involved Defendant possessing vials of PCP, resulted in Defendant's arrest. Two incidents involved Defendant fleeing from the police, both on foot and by car. One incident involved Defendant attempting to evade the police by disposing of PCP in his possession.

4. On the evening of February 24, 2014, upon turning left onto Yuma Street, the officers saw, from a distance, two men walking at a fast pace. The officers drove down Yuma Street toward a cul de sac at the end of the block and observed the two men cross Yuma from the right to the left-hand side of the street, coming from the direction of 133 Yuma. One of the men, later identified as a "Mr. Banks," stopped near the entrance of a house at 144 Yuma Street and made a movement as though he was about to urinate. The other man, who was later identified as the Defendant, continued to walk into a narrow alleyway between 144 Yuma Street and the house next door. The alleyway led into a vacant backyard area where a U-Haul vehicle was parked and partially visible from the street.

5. The officers stopped their vehicle in front of 144 Yuma and got out to investigate. Officer Moseley walked over to Mr. Banks while Officer Olszak followed the Defendant into the corridor between the two houses and toward the backyard area. Both Officer Olszak and Officer Moseley saw Defendant bend down behind the rear left wheel well of the U-Haul and then stand

back up. It was dark and they did not, at that time, recognize Defendant. Officer Olszak testified that while he could not see exactly what Defendant was doing near the U-Haul, he did see him bend over and make a kicking movement. Defendant then stood back up and started walking back with his hands in his pockets, toward Yuma Street and Officer Olszak.

6. Officer Olszak ordered Defendant to remove his hands from his pockets to make sure he didn't have any weapons. Defendant complied and continued to walk toward Officer Olszak. At that point, Officer Olszak recognized Defendant as Mr. Castle. As he approached Defendant, Officer Olszak touched Defendant on his right bicep and told him to "hold on for a sec" before running to the backyard to investigate the U-Haul truck.

7. Defendant continued to walk toward the front of the house where Officer Moseley was with Mr. Banks. Officer Moseley testified that, as the Defendant neared him, he immediately recognized Defendant from prior encounters and smelled the odor of PCP emanating from his person. Defendant had put his hands back in his pocket and appeared agitated and nervous. Officer Moseley ordered him to sit down on the curb near a fire hydrant. The Defendant sat down but immediately jumped back up, stating "man these pants is fresh." Officer Moseley again told the Defendant to sit down and he complied.

8. After the Defendant sat back down, Officer Moseley observed him put his hands back in his pockets for a few seconds and remove a black mitten from his front coat pocket. Defendant then began to squeeze the mitten and Officer Moseley saw a one ounce vial of PCP emerge from the mitten. Defendant then gently placed the vial on the ground, put the black mitten on his left hand, and leaned over the PCP vial as though he was trying to conceal it. Based upon the appearance of the vial and the smell emanating from it, Officer Moseley suspected that it contained PCP. Officer

Moseley arrested Defendant shortly afterward. In a search incident to that arrest, the officers recovered a pack of Newport cigarettes, a cell phone, a pair of black rubber gloves, paperwork in the Defendant's name, and approximately fifteen dollars in cash, all of which Defendant seeks to suppress. In addition, Defendant made a statement to the effect of "you caught me on a weak ass vial," which he also seeks to suppress.

9. While all of this was happening at the front of 144 Yuma, Officer Olszak and another officer were searching the back area near the U-Haul with flashlights. They ultimately recovered from the rear left wheel of the U-Haul an eight ounce bottle of PCP labeled "Market Fresh" and a plastic bag of black vial caps. Officer Moseley did not learn of these items until after the Defendant had been placed under arrest and they did not form the basis of his decision to arrest the Defendant. Defendant does not seek to suppress these items.

## II. DISCUSSION

The Court must first decide when the Defendant was "seized" for Fourth Amendment purposes. "In determining whether a person has been seized within the meaning of the Fourth Amendment, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." United States v. Maynard, 615 F.3d 544, 552 (D.C. Cir. 2010) (citing Florida v. Bostick, 501 U.S. 429, 436 (1991)). "[A] stop or seizure takes place only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Id. (citation omitted).

The Government contends that Defendant was not seized until Officer Moseley ordered him to sit on the curb. Defendant claims he was seized when Officer Olszak told him to "hold on for a sec" in the alleyway. The Court agrees with Defendant. By that time, Officer Olszak had clearly

decided to investigate the situation and ordered Defendant to remove his hands from his pockets. Officer Moseley had detained Mr. Banks at the front of the house. There is no evidence indicating that compliance with Officer Olszak's command was optional. In fact, Officer Olszak testified that he did not, in fact, consider Defendant free to leave at this point. Under these circumstances, by specifically telling Defendant to "hold on for a sec," Officer Olszak clearly communicated to Defendant that he was not free to leave. See United States v. Jones, 584 F.3d 1083 (D.C. Cir. 2009) (defendant was seized when officers approached him and told him to "come here" in order to further investigate).

The Government argues that Defendant was not seized in the alleyway because he did not immediately stop walking and, therefore, had not submitted to the officers' show of authority. Officer Olszak testified that although he told Defendant to stop as they passed each other along the side of the house, he did not wait to speak with the Defendant but immediately ran to the backyard where the U-Haul was located. Officer Olszak testified further that Officer Moseley, who was at the front of the house with Mr. Banks, "took over" the detention of Defendant. Thus, the mere fact that Defendant did not stop in the middle of the alley but continued to walk toward Officer Moseley at the front of the house does not indicate he had not submitted to the officers' authority. In fact, Officer Olszak acknowledged that, although Defendant continued walking toward Officer Moseley and Yuma Street, he was "not trying to go anywhere" and had, by that time, "submitted" to the officers' "show of authority." Thus, the Court concludes that Defendant was seized when Officer Olszak told him to "hold on for a sec."

The Court also concludes that when Olszak told Defendant to "hold on for a 'sec,'" he had a reasonable, articulable suspicion of illegal activity and therefore could detain Defendant briefly for investigatory purposes.

First, Defendant was walking on a stretch of a block well-known for criminal activity and, in particular, the distribution of PCP, in an area of the city well-known for criminal activity. "Although an officer does not have articulable suspicion a person is committing a crime merely because a person is in an area of suspected criminal activity, 'officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" United States v. Bailey, 622 F.3d 1, 5-6 (D.C. Cir. 2010) (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)); see also Edmonds, 240 F.3d at 60 ("[T]he probative value of a neighborhood's reputation as a high-crime area is firmly established.").

Second, as Defendant walked out of the backyard of 144 Yuma, both officers recognized him from several prior PCP-related arrests and incidents occurring on that very block. From these prior encounters, they also knew Defendant was a flight risk and had, in the past, attempted to destroy evidence of PCP distribution and possession.

Third, as the officers drove down Yuma Street, they saw Defendant walking very quickly from the direction of 133 Yuma Street, an address known for PCP distribution and criminal activity, toward a vacant backyard area, suggesting to the officers that he was trying to evade their presence. The officers testified credibly that they patrolled the area so regularly that people in the neighborhood had come to recognize their vehicle and to expect such patrols. Indeed, Officer Olszak testified that people in the neighborhood would act as "lookouts" and alert others to the presence of the police when they arrived in the area. Furthermore, the street ended in a cul de sac, meaning that

non-police traffic was less likely than on another street. Therefore, it was not unreasonable for the officers to believe Defendant knew or suspected their vehicle was a police vehicle and was walking quickly in order to evade them.

Fourth, Defendant's conduct in relation to the house and yard at 144 Yuma Street was itself suspicious. There was no evidence that either Defendant or Mr. Banks knew the owner of 144 Yuma Street or had any lawful reason to be there. Furthermore, there was no indication of what Defendant was doing once he entered private property at 144 Yuma Street, walked into the backyard, bent down near the U-Haul truck and made a kicking movement with his leg. It is well-established that suspicious movements in response to police presence in an area where a defendant has no apparent lawful purpose are a probative factor in the Terry analysis. See, e.g., Edmonds, 240 F.3d at 61 (defendant's suspicious "ducking" movements indicating he was "trying to conceal something" while parked in a school parking lot was probative of criminal activity under Terry).

Finally, immediately after the officers initiated the stop by telling Defendant to "hang on a sec," Officer Moseley smelled the odor of PCP emanating from him and observed that he kept putting his hands back in his pockets even though he had been asked to take them out. This provided yet further basis to suspect illegal activity and continue the investigatory detention. Officer Moseley then observed Defendant remove a vial of PCP from a mitten in his pocket, at which point it is undisputed that he had probable cause to arrest and conduct a search incident to arrest.

In sum, for all of the foregoing reasons, the police officers had more than enough basis on which to have a reasonable suspicion justifying an investigatory stop under Terry.[2]

---

[2] The Government also argues that even if the detention was unreasonable, all of the items seized from Defendant would inevitably have been discovered after the officers found the eight
(continued...)

### III. CONCLUSION AND ORDER

For all of the foregoing reasons, it is hereby

**ORDERED,** that Defendant's Motion to Suppress is **denied.**

July 2, 2014

/s/ Gladys Kessler
Gladys Kessler
United States District Judge

**Copies via ECF to all counsel of record**

---

[2](...continued)
ounce bottle of PCP near the U-Haul truck. The Court need not reach this argument given its conclusion that the Terry stop was reasonable.